ACCEPTED
03-14-00749-CV
4569284
THIRD COURT OF APPEALS
AUSTIN, TEXAS
3/19/2015 3:53:21 PM
JEFFREY D. KYLE
CLERK

No. 03-14-00749-CV

# In the Court of Appeals
# for the Third Judicial District

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS

3/19/2015 3:53:21 PM

JEFFREY D. KYLE
Clerk

THE UNIVERSITY OF TEXAS AT AUSTIN,
*Appellant*,

v.

WILLIAM A. BELLINGHAUSEN, JR.,
*Appellee.*

On Appeal from the 345th Judicial District Court, Travis County, Texas

## APPELLANT'S REPLY BRIEF

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas  78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

SCOTT A. KELLER
Solicitor General

JOSEPH D. HUGHES
Assistant Solicitor General
State Bar No. 24007410
*jody.hughes@texasattorneygeneral.gov*

JASON WARNER
Assistant Attorney General

COUNSEL FOR APPELLANT

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

Index of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.     Only One Reasonable Inference Can Be Drawn From the Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

          A.    No Reasonable Juror Could Believe That the Sidewalk Appeared Dangerously Defective From 150 Feet Away . . . . . . 3

          B.    Henry's Statement That the Unidentified Pedestrian Fell "Right There" Identified the Location of the Fall, Not Its Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          C.    Henry's Knowledge That There Are Uneven Sections of Sidewalk on Campus Is Not Knowledge That an Unreasonably Dangerous Condition Existed Where Bellinghausen Fell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    II.    Henry Did Not "Change His Story" Before His Deposition . . . . . . . 11

          A.    Henry's Identification of the Location Where the Unidentified Pedestrian Fell Does Not Create a Material Fact Dispute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          B.    Henry Consistently Described the Pedestrian as Inattentive . . 14

          C.    There Is No Material Fact Dispute as to Why Henry Interrupted His Work After Bellinghausen's Fall . . . . . . . . . . . 15

Prayer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# INDEX OF AUTHORITIES

## Cases

*Brinson Ford, Inc. v. Alger,*
    228 S.W.3d 161 (Tex. 2007) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

*City of Austin v. Leggett,*
    257 S.W.3d 456 (Tex. App.—Austin 2008, pet. denied)  . . . . . . . . . . . . . . . . .  8

*City of Corsicana v. Stewart,*
    249 S.W.3d 412 (Tex. 2008) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . .  4, 7, 8

*City of Dallas v. Thompson,*
    210 S.W.3d 601 (Tex. 2006) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 8

*City of San Antonio v. Rodriguez,*
    931 S.W.2d 535 (Tex. 1996) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

*Dietz v. Hill Country Rests., Inc.,*
    398 S.W.3d 761 (Tex. App.—San Antonio 2011, no pet.) . . . . . . . . . . . . . . . .  5

*K-Mart Corp. v. Honeycutt,*
    24 S.W.3d 357 (Tex. 2000) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

*Reyes v. City of Laredo,*
    335 S.W.3d 605 (Tex. 2010) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . .  7, 8, 10

*State v. Tennison,*
    509 S.W.2d 560 (Tex. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*Tex. Dep't of Pub. Safety v. Alexander,*
    300 S.W.3d 62 (Tex. App.—Austin 2009, pet. denied)  . . . . . . . . . . . . . . . . .  10

*U.S. Fire Ins. Co. v. Lynd Co.,*
    399 S.W.3d 206 (Tex. App.—San Antonio 2012, pet. denied)
    (op. on reh'g)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-5

*Univ. of Tex. at Austin v. Hayes,*
    327 S.W.3d 113 (Tex. 2010) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

No. 03-14-00749-CV

# In the Court of Appeals
# for the Third Judicial District

THE UNIVERSITY OF TEXAS AT AUSTIN,
*Appellant*,

v.

WILLIAM A. BELLINGHAUSEN, JR.,
*Appellee.*

On Appeal from the 345th Judicial District Court of Travis County

**APPELLANT'S REPLY BRIEF**

TO THE HONORABLE THIRD COURT OF APPEALS:

It is undisputed that David Henry was working 150 to 200 feet away from where he saw an unidentified pedestrian fall, and that he later reported seeing the pedestrian fall "right there." Bellinghausen argues that those words should be interpreted to mean that Henry witnessed not only *where* the pedestrian fell but also *what caused* his fall. But the context in which Henry spoke them precludes that reading. No reasonable juror could believe that, from 150 feet away, Henry identified the sidewalk as dangerously defective. Accordingly, the evidence raises no genuine fact issue as to whether the University had actual knowledge of an unreasonably dangerous condition.

## I. ONLY ONE REASONABLE INFERENCE CAN BE DRAWN FROM THE EVIDENCE.

The undisputed facts include the following:

- maintenance supervisor David Henry was working on the east side of the Skilled Social Work building on the morning of August 27, 2011 when he saw an unidentified pedestrian fall on the sidewalk on the north side of East 20th Street (CR.116 (26:12-25, 29:9-25));

- the location where the pedestrian fell, which was at least 150 feet away (and across the street) from where Henry was working, was the same location where Bellinghausen later fell (CR.115 (23:2-6);

- shortly after Bellinghausen fell, Henry told Officer Gonzalez that, a few hours earlier, the unidentified pedestrian had fallen "right there" (CR.120 (67:3-8)); and

- Officer Gonzalez's police report stated that (1) Bellinghausen said that he "tripped over a protruding crack in the sidewalk" and (2) Henry "was working nearby all morning and said that he saw another person trip and fall on the same protruding crack at about 9:00 am." CR.100.

It cannot reasonably be inferred from this evidence that, at the time the pedestrian tripped, Henry perceived the sidewalk as uneven or identified it as the cause of the man's fall. Instead, it is obvious that, when Henry said the words "right there," he was simply indicating to Officer Gonzales that the earlier fall had happened in the same location as the later fall. Bellinghausen had just shown Officer Gonzalez the expansion joint where the edge of one sidewalk slab was higher than the edge of the adjacent slab, and the officer reasonably inferred that both men had tripped over the same protruding edge.

2

Accordingly, Officer Gonzalez's use of the "same protruding crack" language reflects Henry's identification of the location where the first fall had happened.

Bellinghausen offers a different interpretation. In his version, Henry saw the pedestrian trip on the protruding edge of a sidewalk slab from his post 150 to 200 feet away. Later, after Bellinghausen fell, the manner in which Henry told Officer Gonzalez that the pedestrian had fallen "right there" caused the officer to understand that Henry had identified the uneven sidewalk as the cause of the pedestrian's fall from 150 feet away and prior to Bellinghausen's fall. *See* Pl.'s Br. 19; *id.* at 23 ("Officer Gonzalez saw how the words were said and determined that Henry meant the same protruding crack.").

Bellinghausen's interpretation is not credible. The notion that Henry could perceive a protruding sidewalk edge from 150 feet away is absurd—particularly in light of the fact that the protruding edge was not apparent to Bellinghausen at close range. Because Bellinghausen's interpretation rests upon the implausible inference that Henry has superhuman powers of perception, the evidence raises no genuine fact dispute as to whether the University had actual knowledge of an unreasonably dangerous condition.

A.    **No Reasonable Juror Could Believe That the Sidewalk Appeared Dangerously Defective From 150 Feet Away.**

The sidewalk section at issue, as it existed at the time of Bellinghausen's accident, is depicted in the photographs taken by Officer Gonzalez that are attached as Appendices A and B to this brief and were attached as Appendices B and D to the

3

University's opening brief.  App. A, B; *see* CR.91, 95.[1]  Bellinghausen does not dispute that Henry was at least 150 feet away when he saw the pedestrian fall.  Accordingly, assuming *arguendo* that the uneven expansion joint shown in those photographs could be considered unreasonably dangerous, the issue is whether Henry plausibly could have identified the hazard from 150 feet away.  *See City of Corsicana v. Stewart*, 249 S.W.3d 412, 413 (Tex. 2008) (per curiam) (to invoke legislative waiver of immunity, plaintiff must show actual knowledge of an unreasonably dangerous condition at the time of the accident); *Brinson Ford, Inc. v. Alger*, 228 S.W.3d 161, 163 (Tex. 2007) (per curiam) ("A condition is unreasonably dangerous if it presents an unreasonable risk of harm.").

A review of the photographs confirms that he could not have done so.  *See* Apps. A, B.  The small difference in the heights of the adjoining slab edges would be impossible to perceive from 150 feet, and no reasonable juror could believe otherwise.

In an effort to circumvent that problem, Bellinghausen argues that no expert witness testified that the uneven sidewalk could not have been identified from 150 feet.  Pl.'s Br. 17.  But expert testimony is not needed (and properly should be excluded) regarding matters of common knowledge.  *See K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000) (per curiam) (expert testimony not required to determine whether it was reasonable for plaintiff to sit on rail of cart corral in grocery store); *U.S. Fire Ins. Co. v.*

1. The color copies of the photographs used below (and attached as Appendices A and B) display significantly better contrast than the black-and-white copies that appear in the reporter's record.

*Lynd Co.*, 399 S.W.3d 206, 217 (Tex. App.—San Antonio 2012, pet. denied) (op. on reh'g) (whether hail fell and caused damage in a particular place did not require expert testimony because it was "a matter of personal observation and common sense"); *Dietz v. Hill Country Rests., Inc.*, 398 S.W.3d 761, 765-66 (Tex. App.—San Antonio 2011, no pet.) (expert testimony not needed to determine whether restaurant walkway presented an unreasonable risk of harm or premises owner had knowledge of the hazard). For that reason, no expert testimony was required to establish that Henry could not have identified the expansion joint as dangerously defective from at least 150 feet away.

Bellinghausen also argues that Henry himself did not testify that he could not see the expansion joint from his work site. Pl.'s Br. 17. That argument ignores Henry's testimony that he saw the pedestrian fall but did not see him trip on a protruding sidewalk edge. CR.253 (27:5-13). Bellinghausen does not explain the difference, from Henry's perspective, between *failing* to see the uneven sidewalk and *being unable* to see it. Henry's testimony that he saw the pedestrian fall but did not see him trip on an uneven sidewalk implicitly reflects that he could not perceive any defect from where he stood.

**B.  Henry's Statement That the Unidentified Pedestrian Fell "Right There" Identified the Location of the Fall, Not Its Cause.**

Bellinghausen acknowledges that what Henry actually told Officer Gonzalez was that the unidentified pedestrian had fallen "right there." *See, e.g.*, Pl.'s Br. 6. Those words are audible on the audio portion of the video recording taken from Officer

5

Gonzalez's police car. CR.276 (50:15-23). But they are a statement of location, not causation. Henry did not tell the officer what had caused the pedestrian to trip because he did not see or know the cause. CR.253 (27:7-13); CR.290 (64:17-18).

Instead, Officer Gonzalez reasonably inferred that both men tripped on the same uneven expansion joint based on Henry's report that the pedestrian had fallen in the location of the uneven sidewalk where Bellinghausen had just tripped. Bellinghausen acknowledges this point. *See* Pl.'s Br. 6 ("The police officer . . . identified that Bellinghausen fell on the same protruding crack as the prior fall."); *id.* at 19 (noting that "Officer Gonzalez identified the same protruding crack"). But the issue here is not whether the pedestrian tripped on the same expansion joint; it is whether Henry knew that this particular expansion joint as dangerously defective before he saw it up close in the wake of Bellinghausen's fall. Henry's report that the pedestrian had fallen "right there"—indicating the same section of sidewalk where Bellinghausen fell—is no evidence that Henry knew, before Bellinghausen fell, that the sidewalk was dangerous.

Bellinghausen argues that the "evidence suggests that Henry did see the crack." Pl.'s Br. 18. But the evidence he cites describes Henry's observation of the expansion joint *after* Bellinghausen fell. *See id.* ("After Bellinghausen fell, Henry went over to see what was going on."). Evidence that Henry perceived the uneven condition of the expansion joint *after* the accident cannot be used to show the University's actual

6

knowledge of a dangerous condition *before* the accident.  *See, e.g.*, *City of Corsicana*, 249 S.W.3d at 415-16.

### C. Henry's Knowledge That There Are Uneven Sections of Sidewalk on Campus Is Not Knowledge That an Unreasonably Dangerous Condition Existed Where Bellinghausen Fell.

Bellinghausen argues that Henry's knowledge that this particular expansion joint was dangerously defective can be inferred from his observation of the unidentified pedestrian's fall, combined with his knowledge that sidewalk expansion joints tend to become uneven over time due to tree roots and other factors.  *See* Pl.'s Br. 16 ("Knowledge that there were uneven sidewalks all across campus, that they could be made by tree roots, and that there was a tree nearby makes seeing the initial fall and connecting it to the crack a more reasonable inference for Henry and a jury to make."). As an initial matter, there is no evidence that Henry noticed the tree when he saw the inattentive pedestrian fall.  Moreover, the Texas Supreme Court and this Court have repeatedly rejected similar attempts to establish actual knowledge of a dangerous condition by showing awareness of a tendency for problems to develop.  *See Reyes v. City of Laredo*, 335 S.W.3d 605, 609 (Tex. 2010) (per curiam) ("Awareness of a potential problem is not actual knowledge of an existing danger."); *City of Dallas v. Thompson*, 210 S.W.3d 601, 603 (Tex. 2006) (per curiam) ("[T]he fact that materials deteriorate over time and may become dangerous does not itself create a dangerous condition.").

7

Under Bellinghausen's reasoning, city employees' knowledge that an expansion-joint coverplate tended to become loose over time, together with (1) reports of prior falls in the same area several years earlier and (2) evidence that city employees "had been in the area of the coverplate and probably had walked over it" shortly before the accident, would allow an inference that the city knew that the coverplate was a tripping hazard. *See Thompson*, 210 S.W.3d at 603. Similarly, city employees' knowledge that a low-water crossing tended to flood during heavy rains, combined with a 911 caller's warning several hours before the accident that the waters of a nearby creek were rising and would sweep away cars if left unchecked, would permit an inference that the city knew that a dangerous condition existed at that low-water crossing at the time of the accident. *See Reyes*, 335 S.W.3d at 608-09. But the Supreme Court rejected those arguments. *See id.*; *Thompson*, 210 S.W.3d at 603-04; *see also City of Corsicana*, 249 S.W.3d at 414-16 (city employees' knowledge that a low-water crossing tended to flood during heavy rains, combined with evidence that it was raining hard on the night of the accident and a road upstream from the crossing was closed due to flooding, was insufficient to support an inference that the city knew an unreasonably dangerous condition existed when and where the accident occurred); *City of Austin v. Leggett*, 257 S.W.3d 456, 476 (Tex. App.—Austin 2008, pet. denied) (evidence that an outflow grate on a stormwater retention pond had previously clogged would not support inferences that the city actually

8

knew, at the time of the accident, that the grate was clogged or that a dangerous condition existed at the intersection where the accident occurred).

Bellinghausen attempts to distinguish these and several other premises-defect cases on the ground that none of them involved an employee who witnessed "a prior fall in the same vicinity hours before the incident in question." Pl.'s Br. 14. But that purported distinction wrongly assumes that it was possible for Henry to perceive, from at least 150 feet away, that the unidentified pedestrian's fall was caused by a dangerously uneven expansion joint.

Bellinghausen argues that Henry could draw "a reasonable inference" that the pedestrian "tripped on the thing [Henry] saw all around campus sidewalks." *Id.* at 16. But it is not enough to say that Henry should have assumed that the pedestrian tripped on a sidewalk crack and, based on that assumption, deduced that the sidewalk was dangerously defective. Instead, Henry must have *actually known* that the sidewalk was dangerously defective.

Bellinghausen likens this case to the situation discussed in *City of San Antonio v. Rodriguez*, 931 S.W.2d 535 (Tex. 1996) (per curiam). In that case, the Supreme Court suggested in dicta that a city's knowledge of a wet gymnasium floor might properly be inferred if the evidence showed that the building manager knew that there were leaks in the roof and that it was then raining, "[d]epending on the position of the leaks above the floor and the amount of rain." *Id.* at 537. Bellinghausen argues that "[w]hat we have is

9

essentially a rainy day, with knowledge of leaks, and then seeing someone slip on the floor." Pl.'s Br. 16. His argument is unpersuasive.

This case is much closer to *Thompson* than it is to *Rodriguez*. In the situation discussed in *Rodriguez*, knowledge of the dangerous condition (the wet floor) could be inferred if it was raining hard enough and the roof leaks were located above the floor because "the nature of the leaks and the amount of rain on the roof could make the presence of water on the floor a virtual certainty." *Reyes*, 335 S.W.3d at 609. By contrast, just because tree roots can create uneven sidewalks over time and a pedestrian has fallen near a tree does not make the existence of a dangerous sidewalk "a virtual certainty." *Id.* The pedestrian may have tripped on an uneven expansion joint, or he may have fallen for numerous other reasons unrelated to the condition of the sidewalk. *See* Def.'s Br. at 22-25. The latter inference is even more likely, if, as in this case, the pedestrian was not paying attention. "A fact-finder may not infer an ultimate fact from meager circumstantial evidence that could give rise to any number of inferences, none more probable than another." *Tex. Dep't of Pub. Safety v. Alexander*, 300 S.W.3d 62, 74 (Tex. App.—Austin 2009, pet. denied) (citing *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997)).

In essence, Bellinghausen is arguing that Henry should have surmised, from seeing an inattentive pedestrian trip in the vicinity of a tree, that a hazardous condition existed on the sidewalk. But evidence that a premises owner should have known of a dangerous

10

condition is not evidence of actual knowledge. *See, e.g.*, *Univ. of Tex. at Austin v. Hayes*, 327 S.W.3d 113, 117 (Tex. 2010) (per curiam); *State v. Tennison*, 509 S.W.2d 560, 562 (Tex. 1974) ("Actual knowledge rather than constructive knowledge of the dangerous condition is required."). Bellinghausen failed to create a fact issue as to whether the University had actual knowledge of an unreasonably dangerous condition.

## II.    HENRY DID NOT "CHANGE HIS STORY" BEFORE HIS DEPOSITION.

Bellinghausen argues that a fact question arises from what he describes as differences between Henry's oral statement to Officer Gonzalez on the day of the accident and Henry's later deposition testimony. *See* Pl.'s Br. at 11-13. Bellinghausen deems it suspicious that Henry's deposition testimony is "more detailed and nuanced" than his statement to Officer Gonzalez. *Id.* at 12. But it would be strange if testimony given under oath during a deposition lasting several hours were *not* more detailed than an informal statement given during an interview lasting, at most, a few minutes. Further, a review of the purported differences reveals Bellinghausen's argument as meritless.

### A.    Henry's Identification of the Location Where the Unidentified Pedestrian Fell Does Not Create a Material Fact Dispute.

First, Bellinghausen argues that Henry told Officer Gonzalez that the unidentified pedestrian fell "right there," whereas at his deposition, he testified that Bellinghausen and the unidentified pedestrian fell in the same vicinity. *See id.* But the discrepancy is nonexistent. It is undisputed that Henry told Officer Gonzalez that the pedestrian fell

11

"right there." *E.g.*, Pl.'s Br. at 4. At his deposition, Henry listened to the audio of the police video and agreed that he used those words. CR.293 (67:1-16). Henry's deposition testimony thus confirms, rather than contradicts, his initial statement.

Bellinghausen makes too much of Henry's clarification regarding what he saw. At his deposition, Henry explained that he saw the unidentified pedestrian fall in the vicinity of where Bellinghausen later fell, *i.e.*, within five feet in either direction. CR.255 (29:12-15). Bellinghausen argues that Henry must have designated a more specific location when he told Officer Gonzalez that the pedestrian fell "right there" because "Officer Gonzalez saw how the words were said and determined that Henry meant the same protruding crack." Pl.'s Br. 23. In Bellinghausen's view, this reveals that Henry changed how specifically he identified the fall location between the day of the incident and the day of his deposition, thereby creating a fact issue as to his credibility. *Id.*

But the evidence reveals a simpler explanation. Although Henry initially was able to identify only the approximate location of the unidentified pedestrian's fall from his post at least 150 feet away, he and Officer Gonzalez were at the accident scene when Henry explained that the earlier fall had occurred "right there." Up close, it was apparent to both men that the same uneven expansion joint had likely caused both falls. Indeed, Bellinghausen acknowledges that "Officer Gonzalez identified the same protruding crack." *Id.* at 19. Associating the morning fall with a particular expansion

12

joint provided a more precise location for that fall than what Henry's initial observation (from at least 150 feet) had allowed.

Bellinghausen's other attempts to create a fact question by casting doubt on Henry's deposition testimony likewise fail. For example, he deems it suspicious that "Henry never says [at his deposition] that the first fall did not happen on the same crack, only that he cannot guarantee the first victim tripped on the same crack." *Id.* at 12.[2] But Henry's inability to identify exactly where the unidentified pedestrian fell is consistent with the fact that Henry was at least 150 feet away when he witnessed the fall. And Bellinghausen concedes throughout his brief that Henry merely "saw someone fall in the same area," *id.* at 10, or "in the same vicinity of Mr. Bellinghausen," *id.* at 16; *see also id.* at 15 (discussing "Henry's knowledge that someone fell in the general vicinity of the area where Bellinghausen fell"). Bellinghausen's attempt to manufacture a fact dispute from this chain of events is unavailing.[3]

---

2. Bellinghausen's argument that Henry "told the officer the first fall occurred on the same protruding crack," Pl.'s Br. 17, ignores Henry's subsequent testimony that he identified "the area, not that exact spot." CR.289 (63:19-20). In any event, Henry's exact words ("right there") are undisputed. Bellinghausen recognizes that Officer Gonzalez's written statement about the "same protruding crack" was an inference based on Henry's statement, not a verbatim quotation of Henry's words. Pl.'s Br. 19 ("Based on this information he *reasoned* that Henry saw someone fall on the same protruding crack." (emphasis added)).

3. Henry's ability to identify the approximate area where the pedestrian fell, but not the cause of his fall, is fully consistent with Henry's location and perspective. As Bellinghausen's attorney established at Henry's deposition, the corner the pedestrian was approaching when he fell was the point on the sidewalk closest to Henry's location across the street to the south. CR.296-99 (70:11-73:2); *see* App. A. Seeing the pedestrian approach from an angle gave Henry a better perspective from which to identify location than if the pedestrian had been walking directly toward him. CR.299 (73:3-20).

**B.     Henry Consistently Described the Pedestrian as Inattentive.**

Henry testified at his deposition that the unidentified pedestrian appeared to be looking at his cell phone when he fell.   CR.251 (26:20-22); CR.290 (64:23-24). Bellinghausen complains that Henry did not mention the pedestrian's inattentive state to Officer Gonzalez.  Pl.'s Br. at 20.  But his complaint ignores Henry's comment, which is audible on the police videorecording, about pedestrians tripping because "they're not looking where they're going."  CR.276-77 (50:24-51:11).  Significantly, in reviewing that recording with Henry at his deposition, Bellinghausen's attorney clarified that Henry's comment referred to the unidentified pedestrian, not Bellinghausen:

> Q:     [W]hat we heard on there was something about they're not looking where they're going.
>
> A:     Correct.
>
> Q:     And you told us that for the first guy, that he may have been looking down at his phone.  Right?
>
> A:     Yes, sir.
>
> Q:     You're not making the same suggestion about Mr. Bellinghausen being inattentive, because you didn't see him before he fell.  Right?
>
> A:     That is correct.

CR.277 (51:8-18).  Thus, contrary to Bellinghausen's argument, Henry identified the pedestrian as inattentive both in his initial statement at the scene and at his deposition. Nothing supports Bellinghausen's naked assertion that "[a]ll evidence indicates that

Henry and UT-Austin knew after the first fall that an attentive, phoneless pedestrian tripped on the same dangerous crack hours before Bellinghausen." Pl.'s Br. 8.

Bellinghausen also complains about the absence of any mention of the pedestrian's phone in the police report, arguing that the phone is "a suspicious and important detail to forget." *Id.* at 20. But Henry marked the pedestrian as inattentive, which is the detail that is relevant to whether Henry had actual knowledge of a dangerous condition. And there was no reason for Henry to think, "while watching a man bleeding on the sidewalk," *id.* at 12, that whether an unidentified pedestrian had been carrying a cell phone several hours earlier was an important detail.

If the phone's absence from the police report were truly suspicious, as Bellinghausen now insists, then presumably his attorney would have asked Henry about it at his deposition or deposed Officer Gonzalez. But he did neither. Likewise, although Henry testified that another crew member (Mark McEnelly) also saw the inattentive pedestrian fall, CR.279-80 (53:19-54:15), Bellinghausen did not depose McEnelly. Bellinghausen's newfound suspicion is transparently manufactured.

## C. There Is No Material Fact Dispute as to Why Henry Interrupted His Work After Bellinghausen's Fall.

Bellinghausen posits: "the fact finder must ask herself: Why did Mr. Henry leave the scene of his work to talk to the investigating police officer at the scene of the Bellinghausen fall? . . . The sole reason Mr. Henry left his post and talked to the police

officer . . . was to inform the investigating officer that this was the second fall of the day 'right there' on the 'same protruding crack.'" Pl.'s Br. 7-8. But Bellinghausen later identifies the real reason: "After Bellinghausen fell, Henry went over to see what was going on." *Id.* at 18. Bellinghausen's suggestion that Henry left his work to talk to Officer Gonzalez is further undercut by the fact that it is unclear whether the officer was on the scene when Henry arrived—as Bellinghausen obliquely acknowledges. *See id.* (noting that Henry and Officer Gonzalez arrived "at *or near* the same time") (emphasis added); *see also* CR.249 (23:14-16) (Henry's testimony that he could not recall whether police officers were on the scene of Bellinghausen's fall when he arrived).

There is no doubt that Henry left his work to check on Bellinghausen, or that Henry told Officer Gonzalez about the prior fall in order to share his deduction that both men had fallen in the same place. But neither those facts nor any other evidence suggests that Henry perceived a dangerously defective expansion joint from at least 150 feet away. Because there is no evidence that the University had actual knowledge of an unreasonably dangerous condition, the trial court erred in denying the plea to the jurisdiction.

## PRAYER

The Court should vacate the order denying the University's jurisdictional plea and dismiss Bellinghausen's claims for lack of jurisdiction.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

SCOTT A. KELLER
Solicitor General

  /s/ Joseph D. Hughes
JOSEPH D. HUGHES
Assistant Solicitor General
State Bar No. 24007410

MATTHEW JASON WARNER
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1729
Fax: (512) 474-2697
*jody.hughes@texasattorneygeneral.gov*

COUNSEL FOR APPELLANT,
THE UNIVERSITY OF TEXAS AT AUSTIN

17

## CERTIFICATE OF SERVICE

I certify that on March 19, 2015, an electronic copy of this document was served on the following counsel of record via File&ServeXpress:

Robert Ranco
THE CARLSON LAW FIRM, P.C.
11606 N. IH-35
Austin, Texas 78753
*rranco@carlsonattorneys.com*

COUNSEL FOR PLAINTIFF/APPELLEE
WILLIAM A. BELLINGHAUSEN, JR.

 /s/Joseph D. Hughes
Joseph D. Hughes

## CERTIFICATE OF COMPLIANCE

In compliance with Texas Rule of Appellate Procedure 9.4(i)(2), this brief contains 4,026 words, excluding the portions exempted by Rule 9.4(i)(1). In making this certification I am relying on the word-count feature of the Word Perfect software used to prepare this brief.

 /s/ Joseph D. Hughes
Joseph D. Hughes

# Appendix

## APPENDIX TABLE OF CONTENTS

**TAB**

Photograph showing Skilled Social Work building in background,
looking southwest across East 20th Street (CR.91) . . . . . . . . . . . . . . . . . . . . . . . . . . . A

Photograph showing close-up of uneven sidewalk (CR.95) . . . . . . . . . . . . . . . . . . . . B

Tab A



Tab B

